GOODFELLOW v. DETROIT UNITED RAILWAY.

CARRIERS — STREET RAILROADS — PERSONAL INJURIES — NEGLI-
GENCE.
 Plaintiff, a boy about 13 years of age, boarded an open street
 car with his father, taking seats in the rear of the car. The
 father paid fares for both, and afterwards the boy changed
 his position to the forward end of the car. Upon the con-
 ductor asking him for his fare he stated that his father had
 paid it. He was asked to show where his father was, and
 started to go on the running board to where his father was
 seated, when he slipped and fell from the car, sustaining the
 injuries complained of in his declaration. *Held*, that, as
 plaintiff could easily have pointed out his father without
 leaving his seat, and as there was no evidence showing that
 the conductor obliged him to take a position of danger, there
 was no negligence, and a verdict was properly directed for de-
 fendant.

Error to Wayne; Rohnert, J. Submitted January 11,
1909. (Docket No. 52.) Decided March 3, 1909.

Case by John Carrol Goodfellow, by next friend, against
the Detroit United Railway for personal injuries. There
was judgment for defendant on a verdict directed by the
court, and plaintiff brings error. Affirmed.

*May & Dingeman*, for appellant.

*Corliss, Leete & Joslyn*, for appellee.

HOOKER, J. The plaintiff, a boy over 13 years of age
at the time, and timekeeper in an amusement side show at
the Belle Isle Bridge, in Detroit, in company with his
father, boarded one of defendant's open cars about 11
o'clock in the evening on June 15, 1906. The car had
running boards. They took seats near the rear of the car.
At a stop made by the car the boy changed to the front
seat, facing toward the rear. He was separated from the
outside of the car by one or two persons. Facing him

was a boy who had told him that he intended to "beat his fare." The plaintiff's father paid fares for both himself and plaintiff, while the plaintiff sat with his father. After he had gone to the front of the car, plaintiff was asked twice for his fare, and each time he answered the conductor that his father had paid his fare. The conductor again approached from the rear of the car, this time on the left running board, and again asked plaintiff for his fare, and he again answered that his father had paid it. A boy, said by some witnesses to have been sitting next to the plaintiff and by plaintiff said to have been facing him, was the one who had said to others and to the plaintiff that he intended beating his fare, and that he generally did so, and there was testimony tending to show that he was dodging the conductor by going back upon one running board as the conductor went forward upon the other. After the plaintiff stated for the third time that his father had paid his fare, the conductor, who was distant six or eight feet, on the opposite side of the car, said: "Show me your father." There was testimony that he spoke harshly and in a loud tone. Thereupon the boy got up from his seat, and started along the running board on his side of the car toward the rear of the car, and, slipping off, was hurt.

This action was brought to recover damages, negligence being charged. The first count charged that—

"The said conductor in charge of said car rudely and menacingly insisted that the plaintiff herein show the said conductor where his father, said Willard H. Goodfellow, was, and required and forced by his commanding, menacing, and threatening conduct the plaintiff herein to go out of his seat and place of safety in said vehicle where he was then located, and go out and along the running board or footboard of said car while the said car was going at a high rate of speed."

The second count alleged:

"Its conductor rudely approached plaintiff herein while the said car was going at a high rate of speed, and demanded the payment of his fare; and when the plain-

tiff herein explained that Willard H. Goodfellow, his father aforesaid, had already paid plaintiff's fare, defendant's said servant rudely and menacingly denied that plaintiff's fare had been paid, and rudely and threateningly insisted that the plaintiff herein show the said conductor where his father, said Willard H. Goodfellow, was, and menacingly and threateningly reached for and attempted to grab the plaintiff herein and put plaintiff in fear of bodily harm on the part of said conductor. That plaintiff herein in attempting to avoid the apprehended danger from the said conductor stepped out of his seat and on the running board or footboard of said car."

The learned circuit judge directed a verdict for defendant, apparently upon the ground that the plaintiff had failed to prove negligence on the part of the conductor.

The plaintiff testified on direct examination:

"After the fare was paid, and I had taken my seat in the front part of the car, the conductor came up the aisle, and said 'Give me your fare,' and I said my fare was paid, and he went back and in a few minutes he came up again and said, 'Where is your fare?' and I said 'My fare is paid,' and he came a third time and said 'Where is your fare?' and I said, 'It is paid,' and he said, 'Who paid it?' and I said, 'My father,' and he said, 'Show me your father,' and I went down the aisle to show him my father and I must have made a slip for I fell off, and that is the last I know. When I speak of the aisle, I mean the outside board—the running board.

"*Q.* Now, what was—just explain to the jury what is the manner of the conductor, what was his manner with reference to what he said and did, did he say it in a gentle voice or did he say it—what did he say?

"*A.* In a rough tone.

"*Q.* What was his manner? Indicate, if you can, the tone of voice as far as you can, and anything that he did, or his actions, the actions or tone of voice on the part of the conductor, at the time he gave you those instructions.

"*A.* He said: 'Show me your father.' The conductor was on the opposite side to what I was, and I was within one foot of the other side of the car.  *  *  *

"*Q.* Now, state how you came to fall?

"*A.* I must have missed my hold or slipped.

"*Q.* Slipped?

"*A.* Yes, sir."

On cross-examination he testified:

"*Q.* Do you know a boy that was riding on the car the night of the accident?

"*A.* I didn't know him. I saw him trying to beat his fare.

"*Q.* Who was he?

"*A.* I don't know. I could not tell. He told me he was going to beat his fare before he got on. There was a boy up there that did not pay his fare, and the conductor was trying to locate that boy. I did not get up and go forward and sit next to that boy. He sat in front of me, I think. I cannot explain that exactly. I saw him go up to the back of the car when the conductor came up for my fare.

"*Q.* He had been up in front of the car, and, when the conductor came up this time on the right-hand side, this boy went back on the other side, didn't he?

"*A.* The conductor was on the left-hand side and the boy was on the right-hand side."

This was all of his testimony bearing on the conduct of the conductor.

Julius Suckert testified:

"I was standing on the back of the car, and I heard a rather loud argument on the forward part of the car, and all of a sudden a boy came running along the running board on the left side of the car between the tracks, sideways, grabbing from seat to seat to get back, and he was almost up to the rear when he lost his grip and fell. There were a number of gentlemen back there. The general appearance of the boy indicated that he was very much frightened."

Charles Heck testified:

"*Q.* What first attracted your attention to it with reference to the accident?

"*A.* Why, I heard an argument in the front end of the car that attracted my attention that way naturally, and about the time of the argument or right shortly after that it seems the boy got up from the seat. I didn't see him get from the seat, but I saw him step down on the running board. He probably went a foot or two back of that and slipped by reaching one of those handles. He fell anyway."

On cross-examination he said:

"I think that it is about between seven and eight feet from one running board to the other. The seats were all filled at the time, to the best of my recollection. All were seated. There were some standing on the rear platform. There was nobody on the inside running board. Whether on the other running board I do not remember. This running board is 10 to 12 inches wide, in the neighborhood of 12 inches wide, with handles on the posts. I didn't notice the boy at all before he got up and made the slip. I saw him just as he was stepping down on the running board. He stepped down all right and took hold with his hands of the bars, and apparently passed two or three feet towards the rear and then fell. I think he had got about as far as the second or third seat. I would not be positive of that. I saw the conductor when I heard the argument in front. He was standing on the running board on the east side of the car. He was about the second seat. It may have been the third seat. He was close to the front. I would not say positively. I would not be positive about that. He might have been a little to the rear of the first seat.

"*Q.* What was said at that time was said in such a tone of voice that at your distance you could not tell what was said?

"*A.* No, sir.

"*Q.* If the conductor was opposite the second or third seat when you heard the conversation or voices, he would have been perhaps 7 or 8 or 10 feet from the boy?

"*A.* It depends upon where the boy was sitting. I don't know whether he was in the middle of the seat.

"*Q.* He said he was sitting in the second seat from the west side of the car. That makes the conductor 8 or 10 feet away?

"*A.* It would not be quite that far. The car is not that wide.

"*Q.* But he was back opposite the second seat, you say?

"*A.* Perhaps 6 feet or so.

"*Q.* The noise of the car was as usual in the gearing and moving wheels?

"*A.* The same as a car usually runs.

"*Q.* Of course, in order to speak to a person 7 or 8 feet away, it would be necessary to raise your voice in order to be heard?"

Martin Lang testified:

"I saw the conductor go up there. The conductor asked the boy for his fare. The boy says, 'My father has paid it.' The conductor went to the rear of the car. He was gone two or three minutes perhaps. Then he came up, and asked the boy for his fare again. The boy said, 'My father paid my fare.'

"*Q.* Tell us what the conductor said to the boy. Indicate it as near as you can, his manner in doing it. Indicate what transpired there to the jury. Give us the conversation and his manner and tone.

"*A.* The conductor asked the boy for his fare the second time, and he said, 'My father paid my fare,' and by that the conductor got harsh and he said 'Show me'—

"*Q.* Tell us, state the exact conversation that took place between the conductor and the boy on this last occasion, and, if there is anything done, any actions on the part of the conductor, I should like it if you would indicate those, those actions and the tone of voice on the part of the conductor.

"*A.* The conductor leaned over in the aisle, and said, 'Show me your father, who paid your fare,' and by that the boy got up and started for his father. He said it louder than I said it. The boy got up and left his seat, and went towards the rear end of the car. The boy passed one boy that was sitting on the outside of the seat, and he went down on the running board and straight for the rear end of the car. The conductor started for the rear end of the car, too, on the opposite side."

On cross-examination he said:

"I had known this boy for some time. He was a neighbor of ours once. He lived from 75 to 100 feet from where I was. I had seen another boy up with this boy. I had seen this other boy once or twice before. I seen him on the car. I was talking to the other boy the night the accident happened before I got on the car. Johnny Goodfellow was not with me at the time. This other boy said: 'I am going to beat my fare home. I most generally do.' That boy was up in front next to Johnny. I was three or four seats back from the front seat.   *   *   *   The conversation that I heard between the conductor and John Goodfellow occurred after I had changed my seat. I sat right next to the plaintiff. The conductor was standing on the running board at the time of the conversation. He

was right in between the front two seats both facing one another, on the running board. I was nearest the conductor. Johnny did not say to him, 'I will go back and show you my father.' * * * The first time that I saw Johnny Goodfellow on the car was when I noticed him in the front seat of the car. I did not see him pass from the rear end of the car on the running board up to the front."

This is all of the testimony bearing upon the question of negligence. It justified the inference that the conductor had doubts of the payment of plaintiff's fare, and, when the boy reiterated that his father had paid it, he asked him to show him his father. There is nothing to sustain the allegation of the first count that the conductor required and forced by his commanding manner and threatening conduct the plaintiff to go upon the running board. Nothing indicates that he expected him to do more than designate his father, which he could easily have done without leaving his place. The case is entirely wanting in proof of the allegation in the second count that he menacingly and threateningly reached for or attempted to grab the plaintiff. The entire testimony goes no further than to show a request or demand that he show him his father, said in a harsh and cross tone of voice. There was nothing to indicate to the conductor or lead him to anticipate the action of the plaintiff. It was his plain right and duty to ascertain whether this fare had been paid, and a right to have plaintiff point out the person who had paid it. That is all that he asked the plaintiff to do, and the plain implication of the question was that he would ask such person if the statement of the boy was true. There was nothing to cause the boy to attempt to escape from the conductor and nothing which required the conductor to anticipate such action. Hence there was no negligence.

The judgment is affirmed.

GRANT, MONTGOMERY, OSTRANDER, and MOORE, JJ., concurred.